UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Lisa A. Boyd,                                           Case No. 3:17-cv-677

        Plaintiff

    v.                                                  MEMORANDUM OPINION
                                             AND ORDER

Zepf Center,

        Defendant.

## I. INTRODUCTION

Before me is the motion for summary judgment filed by Defendant Zepf Center. (Doc. No. 34). Plaintiff Lisa A. Boyd filed a memorandum in opposition, (Doc. No. 43), and Defendant replied, (Doc. No. 44). Plaintiff also filed a motion to strike a portion of Defendant's reply, (Doc. No. 45), to which Defendant filed a memorandum in opposition, (Doc. No. 46), and Plaintiff replied, (Doc. No. 47).

## II. BACKGROUND

Lisa Boyd worked in the fiscal department for Zepf Center ("Zepf") from 2011 until her termination in February 2016. (Doc. No. 43 at 6). Boyd suffers from multiple conditions, including major depressive disorder and generalized anxiety disorder. (*Id.* at 7). During her time at Zepf, Boyd also struggled with high blood pressure, migraine headaches, and post-traumatic stress disorder ("PTSD"). (Doc. No. 30 at 9). Boyd claims Zepf discriminated against her because of her

disabilities in violation of the American with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Ohio law. (Doc. No. 1). Specifically, Boyd contends Zepf: (1) discriminated against her because of her disabilities when terminating her employment; and (2) denied her reasonable accommodations for her disabilities while she worked there.

Boyd's termination occurred following a difficult period for both Boyd and the fiscal department at Zepf as the company navigated switching from one human resources software provider, DSC, to another, ECI. Boyd, whose principal job duties involved payroll administration, found her workload greatly increased as a result of implementing ECI, and she testified to a litany of problems with the system that forced her to work longer hours under increasing amounts of stress. (Doc. No. 30 at 11-16). Boyd asked her immediate supervisor, Gail Errington, if the company could hire an additional person to help Boyd with the additional work caused by the new system, but Errington told her that could not be done. (*Id.* at 12, 16).

Boyd also voiced her frustrations to Kathi Cesen, Zepf's Chief Financial Officer, telling Cesen the new system was causing Boyd to suffer significant amounts of stress at work and, on at least one occasion, asking Cesen if Zepf could hire someone to help Boyd with her work. (*Id.* at 15-16). Cesen told Boyd hiring an additional employee would not be possible. (*Id.* at 16). Cesen did attempt to help Boyd cope with the symptoms she was suffering from by suggesting Boyd take advantage of Zepf's employee assistance program. (*Id.* at 15).

One of Boyd's coworkers in the fiscal department, Patricia Osborn, noticed Boyd suffering from various ailments at work around the time the ECI system was implemented. (Doc. No. 43-6). Osborn testified she frequently saw Boyd crying at work and noticed Boyd looking pale and visibly shaking at times. (*Id.* at 2). At various times, Boyd told Osborn she was feeling overwhelmed and suffering from high blood pressure, depression, migraine headaches, exhaustion, and trouble sleeping. (*Id.*). On at least one occasion, Boyd told Osborn she was having a panic attack. (*Id.*).

Boyd claims Osborn was not the only person aware of the symptoms Boyd was exhibiting. (Doc. No. 30 at 17). Boyd testified that many of her coworkers in the fiscal office were aware she was struggling with frustration and anxiety at work. (*Id.*). Boyd also testified she frequently voiced her struggles with various symptoms during weekly meetings between fiscal and human resources during the transition to ECI. (*Id.*). Along with Boyd, Errington, and Cesen, those regularly present at these meetings included: Christina Baskey, Zepf's Director of Administrative Services, whose primary duties involved overseeing the Human Resources department; and, eventually, Jason Flynn, who was hired by Zepf in 2015 as a director of Human Resources. (Doc. No. 43 at 19-20).

While Boyd did not use the word "disability" during these meetings, she claims she frequently told those present that she was overwhelmed and frustrated by the ECI system. In the course of doing so, Boyd specifically mentioned some of the symptoms caused by the stress of working with the system. (Doc. No. 30 at 26). Boyd admits she did not discuss her symptoms at length because the primary purpose of the meetings was to get the new payroll system to run correctly. (*Id.*). But Baskey testified to seeing Boyd cry from her frustration with ECI during one of these meetings. (Doc. No. 28 at 21). Baskey also testified that both Cesen and Errington informed her Boyd was overwhelmed at work due to the problems caused by ECI. (Doc. No. 28 at 22, 27).

On January 4, 2016, Baskey sent an email to Cesen detailing mistakes Boyd made, including: failing to deduct union dues from certain employees' paychecks; failing to pay certain employees' mileage reimbursements; failing to pay an employee's sign-on bonus; failing to update an employee's tax records following their move; and failing to follow up and acquire timesheets from a group of employees that did not submit them. (Doc. No. 33-27 at 2). Flynn was also copied on this email. (*Id.* at 1). Baskey concluded Boyd was making "even basic mistakes" with payroll and advised Cesen that something needed to be done. (*Id.* at 2).

Cesen responded by generally defending Boyd's performance, attributing many of the issues to problems caused by the ECI system. Cesen also suggested the human resources department coordinate with the fiscal department to clearly define the steps of the payroll process, including delegating tasks to specific staff members for the sake of accountability. (*Id.* at 1-2). Baskey forwarded Cesen's response to Zepf's CEO, Jennifer Moses, stating, "This is the response I got….basically it is not Lisa's fault and we should sit down and map out every situation." (*Id.*).

On January 15, 2016, Moses sent two emails to Cesen about Boyd. In the first, Moses sent Cesen a list of Boyd's performance issues and demanded Boyd be disciplined by January 20. (Doc. No. 43-4 at 8). After recognizing this list as the same one Baskey had sent her previously, Cesen asked Baskey to send her and Errington more information about the listed performance issues. (*Id.*; Doc. No. 33-30). Baskey agreed but, according to Cesen's testimony, Baskey never did so. (Doc. No. 43-4 at 9).

Just over an hour later, Moses sent Cesen the second email. This time, Moses told Cesen to work with Baskey to fix an error Boyd made regarding the appropriate deduction for Moses's retirement plan, and ordered Boyd be fired by January 20. (Doc. No. 33-31). Moses wrote Boyd was "incompetent" and "creates internal problems every payroll with her errors." (*Id.*).

Cesen responded the following morning, informing Moses she had spoken with Baskey and the plan was for Baskey to try and locate an ECI payroll specialist on the coming Monday. (Doc. No. 33-36 at 2). Cesen went on to write that, while she and Baskey would work together to terminate Boyd "as expeditiously as possible," moving too fast would be bad for Zepf. (*Id.*). Rather than terminate Boyd before January 20, Cesen suggested Baskey and Cesen develop a termination timeline after a January 21st meeting in which the fiscal and human resources departments were to determine workflows and responsibilities between the two departments. (*Id.*). Baskey was copied on this email. (*Id.*).

4

Baskey took issue with a portion of Cesen's January 16 response to Moses. In a response on January 17, Baskey disputed that human resources was responsible for handling the issues Cesen referenced, and Baskey placed further blame on Boyd for the delays the company had encountered implementing the time and labor management (TLM) system. (*Id.*). Cesen responded to Baskey on January 18, asserting Boyd was not responsible for handling TLM duties and providing a detailed timeline of the events leading to the delay which placed responsibility for the setback on various other individuals. (*Id.*). Moses was copied on this chain of emails. (*Id.*).

On February 17, 2016, Baskey, Cesen, and Flynn met with Boyd and notified her of her termination. (Doc. No. 30 at 18). When Boyd asked why she was being fired, Baskey told her it was because of multiple errors, including: union dues mistakes, paid time off mistakes, and pension mistakes. (Doc. No. 43-2 at 5; Doc. No. 31 at 7-8). Boyd pushed back, claiming those were all minor mistakes, but Flynn advised these minor mistakes were cumulative in nature. (Doc. No. 43-2 at 5-6). After Zepf went through a series of temporary employees, Boyd was eventually replaced by an individual she alleges does not have a disability. (Doc. No. 29 at 5-6).

In its answer to interrogatories, Zepf stated that, while Moses made the decision to fire Boyd, she also consulted Cesen, Errington, and Baskey after instructing Cesen to terminate Boyd's employment in the January 15 email. (Doc. No. 43-1 at 4). Moses testified that Baskey informed her of Boyd's errors prior to the January 15 email. (Doc. No. 31 at 10). Baskey testified she did not have any involvement in the decision to terminate Boyd beyond being present at the meeting. (Doc. No. 28 at 32). Cesen and Errington both testified they did not believe Boyd deserved to be fired. (Doc. Nos. 43-4 & 43-5).

Boyd filed a Charge of Discrimination with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission (EEOC) on February 26, 2016, and Boyd was sent a "right to sue" letter on January 5, 2017. (Doc. No. 1).

5

### III. STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. DISCUSSION

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An employer's failure to provide reasonable accommodations to a disabled employee falls within the scope of discrimination prohibited by the act. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (quoting 42 U.S.C. § 12112(b)(5)(A)).

Boyd alleges the Zepf violated the ADA and Ohio discrimination law by terminating her and failing to provide her a reasonable accommodation to perform her job. Boyd's federal and state law claims for failure to accommodate can be analyzed together. *See Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004) (analyzing claims brought under O.R.C. § 4112.99 under the same framework as claims brought under the ADA).

A.      **Boyd's Termination**

Because Boyd seeks to prove Zepf discriminated against her by terminating her employment through indirect evidence, her claims are subject to the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016). Under this framework, Boyd must first establish a *prima facie* case of disability discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802 (1973); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). If she does so, the burden shifts to Zepf "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 252 (quoting *McDonnell Douglas*, 411 U.S. at 802). If it does so, Boyd must introduce evidence showing "that the legitimate reasons offered by defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 252 (citing *McDonnell Douglas*, 411 U.S. at 804).

To establish a *prima facie* case of disability discrimination, Boyd must show:

> (1) [ ]she is disabled; (2) [she was] otherwise qualified for the position, with or without reasonable accommodation; (3) [she] suffered an adverse employment decision; (4) [Zepf] knew or had reason to know of [her] disability; and (5) the position remained open while [Zepf] sought other applicants or [she] was replaced.

*Tennial v. United Parcel Serv.*, 840 F.3d 292, 306 (6th Cir. 2016) (further citation omitted). Boyd must also show her disability is a "but-for" cause of the adverse employment action. *Id.* (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc)). Zepf disputes the second and fourth elements.

1.      **Otherwise Qualified**

"An employee is deemed qualified only if she can perform all of the essential functions of her job, whether accommodated or not." *Williams v. AT&T Mobility Servs.*, 847 F.3d 384, 391 (6th

7

Cir. 2017) (citing 42 U.S.C. § 12111(8)). Determining whether something is an essential function "is highly fact specific." *Hoskins v. Oakland City Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000).

Zepf contends Boyd was not qualified because, as Baskey's emails to Cesen and others show, Boyd was responsible for numerous errors in payroll during the implementation of ECI. (Doc. No. 34-1 at 13; Doc. No. 44 at 4-7). But Boyd presents evidence she was in fact qualified.

Boyd argues many of the errors Zepf identifies are not attributable to her. For example, Cesen testified that Leah Granville, an employee in the human resources department, often made errors when providing Boyd with inputs, causing Boyd to spend more time to catch those of Granville's mistakes that she could. (Doc. No. 43-4 at 6). Also, Cesen testified that Moses was wrong to blame Boyd for improperly calculating Moses's retirement deductions. (Doc. No. 43-4 at 11).

Boyd also provides testimony from her supervisors, Errington and Cesen, both of whom said Boyd performed her job well and did not deserve to be fired. Shortly after learning Moses wanted Boyd fired, Cesen called Baskey to tell her what a mistake it would be to let Boyd go. (Doc. No. 43-4 at 11). Errington, Boyd's immediate supervisor, testified that Boyd was a "diligent and faithful worker. . . with a high degree of accuracy." (Doc. No. 43-5 at 4). And Patricia Osborne, one of Boyd's coworkers in the fiscal department and someone who regularly relied on Boyd's work to do her job, also testified to Boyd's abilities to perform her job capably. (Doc. No. 43-6). Boyd also received generally positive performance reviews and was only given one written citation during her time with Zepf, and even that citation was eventually removed from her record. (Doc. No. 43-3 at 30-34).

Based on the evidence above, a reasonable jury could easily conclude Boyd was qualified to perform the essential functions of her position.

### 2. Employer's Knowledge

Boyd "cannot be subject to an adverse employment action based on [her] disability unless the individual decisionmaker responsible for [her termination] ha[d] knowledge of that disability." *Tennial*, 840 F.3d at 306. It is not enough for Boyd to show Zepf had a general knowledge that a disability exists. Instead, she must show the decisionmaker was aware of the specifics of her disabilities or restrictions. *Id.* (citing *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015)).

Although Baskey, Flynn, and Cesen were present at the meeting where Boyd was terminated, it was Moses who made the decision to terminate Boyd's employment. (Doc. No. 28 at 32; Doc. No. 43-1 at 4). Boyd does not present any evidence to show Moses was actually aware of Boyd's disabilities. Instead, Boyd first attempts to establish the knowledge requirement by arguing "Zepf had constructive knowledge" of her disabilities. (Doc. No. 43 at 56). An employee's symptoms, if severe enough, can put the employer on notice of a disability. *See Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 737 (6th Cir. 2015). But Boyd still needs to show it was Moses specifically who should have been on notice. *See e.g. Tennial*, 840 F.3d at 306.

Moses testified she did not have significant substantive interactions with Boyd during Boyd's employment with Zepf. (Doc. No. 32 at 5). Nor is there evidence that someone informed Moses of Boyd's condition. While Cesen and Errington knew Boyd suffered from various medical ailments, there is no evidence that either of them communicated this knowledge to Moses at any time.

Even so, Boyd claims she can satisfy the knowledge requirement by invoking the "cat's paw" doctrine. (Doc. No. 43 at 57). "'In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'"

*Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006)).

Here, Boyd asserts it was Baskey who influenced Moses's decision. Boyd argues Baskey had knowledge of Boyd's medical and emotional conditions and contends Baskey was biased against Boyd. But Boyd's argument falls short because there is no evidence to show Baskey had knowledge of Boyd's disabilities, or that any animus Baskey held toward Boyd was motivated by the kind of discrimination prohibited by the ADA.

Boyd's claim that Baskey was aware of Boyd's disabilities is not supported by the evidence. Boyd does not claim she ever told Baskey directly that she was disabled. Instead, Boyd relies on her testimony about the meetings between the fiscal and human resources departments, which Baskey regularly attended. (Doc. No. 30 at 17-18). During these meetings Boyd disclosed she was feeling frustrated, anxious, and overwhelmed. (*Id.*). Boyd also points to Baskey's testimony that on at least one occasion she saw Boyd crying at one of these meetings. (Doc. No. 28 at 21). This is not enough.

While the cat's paw theory allows Boyd to shift the focus from Moses to Baskey, Boyd still must show Baskey had more than some general knowledge that a disability exists. *See Tennial*, 840 F.3d at 306. Boyd fails to do so.

At most, Boyd has provided evidence to suggest Baskey knew Boyd was suffering from extreme stress. But there is no evidence to show Baskey knew Boyd's symptoms stemmed from a disability rather than the admittedly stressful circumstances at work. Without more, a reasonable jury could not conclude Baskey knew Boyd was suffering from a disability. Therefore, Boyd cannot establish the requisite knowledge using a cat's-paw theory.

Because Boyd fails to demonstrate the "knowledge" prong of a *prima facie* disability discrimination case, I need not address the remaining steps under the *McDonnell Douglas* burden-

shifting framework. Instead, I hereby grant Zepf summary judgment on these termination-related claims.

**B.     Failure to Accommodate**

The Sixth Circuit has recently clarified that claims based upon an employer's failure to accommodate "necessarily involve direct evidence (the failure to accommodate) of discrimination." *Fisher*, 2020 WL 939192, at *4 (6th Cir. Feb. 27, 2020) (collecting cases applying the direct evidence standard to failure to accommodate claims); *see also* 42 U.S.C. § 12112(b)(5)(A) (including failing to make reasonable accommodations to the known physical or mental limitations of an employee or applicant in the Act's definition of discrimination). This is because in the ordinary failure to accommodate case, there can be no dispute the employer considered the employee's handicap when making its decision not to accommodate the employee's request. *See Ferrari*, 826 F.3d at 892. Indirect evidence typically plays no role in the analysis because the very act of refusing to accommodate the employee's request for an accommodation is itself a form of discrimination.

To succeed on this claim for denial of a reasonable accommodation, Boyd must first show she proposed an objectively reasonable accommodation. *Tennial*, 840 F.3d at 307 (citing *Talley*, 542 F.3d at 1108). "Employees must not only 'request to be accommodated, but must also provide their employers with a sufficient basis to understand the request is being made because of their disability.'" *Tennial*, 542 F.3d at 307 (quoting *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016)). Although there is no bright-line test to determine whether an employee has requested an accommodation, "'at a minimum [Boyd] must make it clear from the context that the request is being made in order to conform with existing medical restrictions.'" *Tennial*, 542 F.3d at 307 (quoting *Deister*, 647 F. App'x at 658) (further citation and internal quotation marks omitted).

Boyd alleges she requested the following two accommodations: (1) for Zepf to hire her an assistant; and (2) for Zepf to go back to the computer system it was using before ECI. (Doc. No. 43

11

at 47). But neither of these requests can serve as the basis for Boyd's failure to accommodate claims because Boyd presents no evidence the individuals who denied the request had any reason to know the requests were being made to accommodate a disability.

For example, Boyd claims she asked both Errington and Cesen if Zepf could hire an assistant to help her with payroll process duties. (Doc. No. 30 at 22, 26). Boyd also presents evidence to show that Errington and Cesen were aware of the symptoms she was suffering at work. (Doc. No. 43-5 at 4). But even if I assume that knowledge was enough for Errington and Cesen to know the request for an assistant was related to Boyd's disabilities, it was not Errington and Cesen who denied Boyd's request. Just as Boyd's claim for disability discrimination could not succeed without evidence the individuals responsible for her termination had knowledge she was disabled, her failure to accommodate claim cannot go forward without proof the individual who denied her requests had reason to know the requests were being made in order to conform with existing medical restrictions.

Cesen testified she thought hiring an additional person to help with payroll was a reasonable request but when she relayed it to Moses, Moses refused to even consider it. (Doc. No. 43-5 at 5). Boyd presents no evidence that when doing so, Moses had reason to know Boyd made the request because of her disabilities. Similarly, Boyd presents no evidence Errington or Cesen had the authority to accommodate her request that Boyd pay approximately $20,000 to buy out of its contract with ECI and switch to a new provider. (Doc. No. 43-3 at 14). Nor does Boyd provide evidence that Errington or Cesen relayed that request to anyone else.

Finally, Boyd argues Zepf should be liable because it failed to engage in the interactive process. (Doc. No. 43 at 49). Under the ADA's regulations, "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. §

12

1630.2(o)(3).  While the interactive process is mandatory, *Kleiber*, 485 F.3d at 871, it is not triggered until the employee requests a reasonable accommodation.  *Arthur*, 625 F. App'x at 711.  Because Boyd never made the requisite request, there was no duty for Zepf to violate.

In sum, Boyd cannot show Zepf failed to accommodate any requests for a "reasonable accommodation to [any] *known* physical or mental limitations."  *See* 42 U.S.C. § 12112(b)(5)(A) (emphasis added).

### C. Boyd's Motion to Strike

Boyd filed a motion to strike a portion of Zepf's reply in support of its motion for summary judgment on the grounds Zepf raised arguments in its reply that were not raised in its motion for summary judgment.  (Doc. No. 45).  Specifically, Boyd argues Zepf never raised the "honest belief rule" in its initial motion for summary judgment.  The honest belief rule is relevant only to the question of pretext in the third step of the *McDonnell Douglas* burden-shifting framework.  Because Boyd failed to establish a *prima facie* case of disability discrimination at the first step, pretext is not an issue here.  Therefore, I do not find it necessary to strike a discussion of this now irrelevant issue and deny Boyd's motion as moot.

### V.   CONCLUSION

For the foregoing reasons, I grant Zepf's motion for summary judgment, (Doc. No. 34), and deny Boyd's motion to strike.  (Doc. No. 45).

So Ordered.

s/ Jeffrey J. Helmick  
United States District Judge